# UNITED STATES DISTRICT COURT
for the
Eastern District of California

**FILED**
Aug 09, 2024
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 2:24-sw-0776 CKD
)
Two cellular telephones seized from )
Javier Aguilera Rosas on June 18, 2024 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the   EASTERN   District of   CALIFORNIA  , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1028(a)(2) | Transfer of Fraudulent Identification Documents |
| 42 U.S.C. § 408(a)(8) | Misuse of a Social Security Number |

The application is based on these facts:

See Affidavit of FBI Special Agent John Ogden

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

FBI Special Agent John Ogden
*Printed name and title*

Sworn to before me telephonically and signed

Date: August 9, 2024 at 3:53 pm

*Judge's signature*

City and state: Sacramento, California     Hon. Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR WARRANT TO SEARCH DEVICES

I, John W. Ogden, being first duly sworn, hereby depose and state as follows:

### I. INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices seized from Javier Aguilera Rosas—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2009.  Over the course of my career, I have served as the affiant on numerous search warrants authorizing law enforcement to search electronic devices.

3.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  The facts set forth in this affidavit are based on my own personal knowledge, as well as on facts and information relayed to me by other law enforcement agents.

### II. IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.  The property to be searched consists of the following electronic devices:

a)  A black Apple iPhone, with a cracked back, which is assigned FBI evidence number 1B158 ("Subject Device 1");

b)  A black Apple iPhone, which is assigned FBI evidence number 1B159 ("Subject Device 2").

5.  The Subject Devices are currently located at the FBI's secure evidence storage facility at 2001 Freedom Way, Roseville, California 95678.  The applied-for warrant would authorize the forensic examination of the Subject Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### III.     FACTS ESTABLISHING PROBABLE CAUSE

***Serial fraudster, Myra Minks, arrested while traveling in possession of false identification documents ("IDs").***

6.      On or around June 17, 2022, Minks was arrested pursuant to a June 1, 2022 warrant as she deplaned from a United Airlines flight in Las Vegas, Nevada, that originated in Houston, Texas.  At the time of her arrest, Minks was in possession of a counterfeit Massachusetts driver's license and a counterfeit Social Security Administration ("SSA") card, each bearing the name "Aria Camila Manalo."  United Airlines personnel confirmed that a passenger listed as "Aria Manalo" was on the manifest for the flight from which Minks was deplaning when she was arrested.  United Airlines personnel also confirmed that the flight manifest did not list Myra Minks as a passenger.

7.      Minks gave consent to law enforcement to search the luggage she was traveling with on this flight.  Law enforcement searched Minks' baggage pursuant to her consent and the baggage tags on that luggage bore the name Aria Manalo.

8.      At the time of her arrest, Minks was also in possession of a United States passport card and another counterfeit SSA card, each bearing the name "Alyxes Maddison Palazzo."

9.      I contacted SSA personnel regarding the two counterfeit SSA cards in Minks' possession at the time of her arrest.  SSA personnel indicated to me that the Social Security numbers on the cards bearing the names "Aria Camila Manalo" and "Alyxes Maddison Palazzo" were both fake and not assigned by the SSA to anyone.

***Evidence in Minks' phone points to the source of the false IDs in her possession.***

10.     Incident to Minks' arrest, law enforcement agents seized three cellular telephones. These three cellular devices were subsequently entered into FBI evidence and assigned evidence identification numbers 1B138-CP1, 1B138-CP2, and 1B138-CP3.  Law enforcement agents subsequently searched these three devices pursuant to a search warrant issued on August 18, 2022, by United States Magistrate Judge Deborah Barnes.  2:22-sw-00561-DB.

11.     Law enforcement observed that 1B138-CP3 contained an installation of Phoner,

and that Minks used Phoner to exchange text messages with cellular telephone number 213-531-1059.[1]  Based on my training, experience, and publicly available information, I know that Phoner is an application for mobile electronic devices that allows users to send electronic messages using a different contact number than the number associated with the mobile device itself.  The messages on Minks' phone (1B138-CP3) included the following, with some intervening messages omitted:

| Likely Sender | Message Text |
|---|---|
| Minks | Do a deal for me. Please. Really an emergency for me. $800 both and 2 social cards. I send money today or tomorrow morning. Please |
|  | [messages omitted] |
| Aguilera Rosas | Send the money to Erica sanchez western union |
| Aguilera Rosas | Los Angeles |
| Minks | Ok do you have a cash app amigo or Zelle |
| Aguilera Rosas | Send in Zelle the name is Javier aguilera phone number 213 5311471 |
|  | [messages omitted] |
| Aguilera Rosas | Send me the picture information and signature |
| Minks | Ok |
| Minks | MA<br>Aria Camila Manalo<br>XXX Highwood Way<br>Mashpee, MA 02649<br>XXXX, XX, 1984 |
| Minks | 5 2"<br>150 pounds |

---

[1] The forensic electronic device examination tool that law enforcement used to extract data from 1B138-CP3 does not appear to have the capability to associate Phoner messages with individual users.  Hence, the Phoner messages extracted from 1B138-CP3 appear as one string of messages unconnected to any particular sender.  Nonetheless, based on my more than 15 years of experience and my knowledge of this investigation, I believe the Phoner messages on 1B138-CP3 demonstrate that Minks, as the user of 1B138-CP3, coordinated the purchase of false identity documents with the user of phone number 213-531-1059.

| Likely Sender | Message Text |
|---|---|
|  | Brown eyes<br>Black hair |
| Minks | Passport<br>Alyxes Maddison Palazzo<br>XXX, XX 1980<br>Place of Birth<br>Honolulu, HI<br>USA |
| Aguilera Rosas | [Messages omitted] |
| Minks | $830 sent |
| Minks | Aria Manalo<br>XXX-XX-9837<br>Alyxes Palazzo<br>XXX-XX-9657<br>Social Card |
| Aguilera Rosas | Ok |
| Minks | My friend, I will send you address.  Thank you so much.  Overnight my friend. Not mail. Let me five you a fed ex account number or maybe you can have someone send for you.  It's an emergency |
| Aguilera Rosas | Ok in fedex |
| Aguilera Rosas | I start to work now ok |
| Minks | Thank you |
| Minks | Eugene Williams<br>C/O wallgreens<br>XXX Smith St<br>Houston, TX 77006<br>Please do fed ex overnight<br>By 10am<br>You can use this account number XX XXX 0996<br>Please don't give the account info out<br>You will not need id amigo to send when you use account number<br>When you go, just tell them you have an account number to use and give them they number. |

| Likely Sender | Message Text |
|---|---|
| Minks | Send me tracking receipt. Thank you. My friend buy more Friday. |
| Aguilera Rosas | Ok |
|  | [Additional messages below omitted] |

12. Based on this text exchange and Minks' subsequent possession of false IDs meeting the specifications set out in that communication as she traveled from Houston to Las Vegas, I believe the person Minks was exchanging messages with created the false IDs.

***Aguilera Rosas identified as the person creating false IDs for Myra Minks after he created new false IDs for an FBI undercover agent.***

13. On December 6, 2023, an FBI agent acting in an undercover capacity ("UC") contacted cell phone number 213-531-1059 pretending to be a previous customer. The UC requested a California driver's license and provided a picture, name, date of birth, height, weight, hair color, and eye color to be used for the fake ID. The UC also requested a SSA card in the same name, and the UC provided a fake Social Security number. The user of 213-531-1059 agreed to create the false IDs in exchange for $360 and to send the false IDs via FedEx to an address in Sacramento.

14. The user of phone number 213-531-1059 requested payment via Western Union in the name "Javier Aguilera Rosas."

15. The UC subsequently received a text message from the user of 213-531-1059 with a photograph of a FedEx envelope addressed to the UC's requested address and indicating that the sender provided the phone number 213-531-1059.

16. Subsequently, the FBI UC received a FedEx parcel with a California driver's license and SSA card as requested. The cards were wrapped in three pieces of paper. The IDs and paper were sent to the FBI lab for fingerprint analysis. On April 12, 2024, I received a final report from the FBI lab. The IDs did not have any latent fingerprints. However, all three pieces of paper contained latent fingerprints of the same person, Javier Aguilera Rosas.

***Aguilera Rosas located in possession of a phone with number 213-531-1059***

17. On June 14, 2024, the Honorable Carolyn K. Delaney, of the Eastern District of California signed a warrant authorizing a search warrant for prospective location information for cellular telephone number 213-531-1059.  2:24-sw-0625 CKD.  On June 17, 2024, I received location information that indicated the phone was in the South Lake Tahoe, California area.  New prospective location information ceased on the evening of June 17, 2024.  In my training and experience, this is consistent with the cell phone being turned off or otherwise failing to connect to the cellular network.

18. On June 18, 2024, an agent located a vehicle associated with this investigation in the vicinity of the cell phone location received on June 17, 2024.  The vehicle was followed from South Lake Tahoe down Highway 50 to the Folsom, California area.  At this point, I followed the vehicle until it reached Woodland, California.  At about the same time we reached Woodland, new prospective location information was received for cellular telephone number 213-531-1059, which was consistent with the location of the vehicle I was following.

19. While the vehicle was stopped at a gas station in Woodland, California, I placed a call to cellular telephone number 213-531-1059 while the driver and front seat passenger were out of the vehicle.  I then observed the driver of the vehicle quickly move around the vehicle, access the driver side door, and answer the call.  I then walked toward the vehicle and placed another call.  I observed the driver holding the ringing phone.

20. I recognized the driver as Javier Aguilera Rosas, and he identified himself as Javier Aguilera Rosas.  Aguilera Rosas was placed under arrest.  I recovered the cell phone, a black Apple iPhone (Subject Device 2), which Aguilera Rosas dropped on the front driver seat.

21. A female passenger was seated in the second row on the driver side of the vehicle.  She provided a California driver's license, which identified her as Erica Sanchez.  Sanchez told me the phone Aguilera Rosas was using was actually her phone.  She went on to explain that Aguilera Rosas' phone was damaged in the pool while on vacation in South Lake Tahoe.  During the drive to Woodland, the SIM card from Aguilera Rosas' phone was removed and inserted into

Sanchez's phone.  Sanchez then confirmed that a black Apple iPhone with cracks on the rear side (Subject Device 1), which was sitting on the center console in the front of the vehicle, was Aguilera Rosas' phone - the phone from which the SIM card had been removed.  Both phones were seized incident to arrest.

22.     There is probable cause to search both Apple iPhones seized from Aguilera Rosas.  Both Sanchez and Aguilera Rosas confirmed that Subject Device 1 belongs to Aguilera Rosas and that the SIM card for telephone number 213-531-1059 was removed from that phone during the drive from South Lake Tahoe to Woodland that same day.  Subject Device 2 is the phone Aguilera Rosas possessed at the time of arrest, and it was ringing in his hand when cellular telephone number 213-531-1059 was called.  Even if Subject Device 2 was primarily used by Sanchez, there is probable cause to believe Sanchez was involved in the false ID scheme.  As stated in the Phoner text messages observed on evidence item 1B138-CP3 and described above, Aguilera Rosas requested payment for false IDs be sent to Sanchez via Western Union.  In this case and in my training and experience, confederates frequently communicate via cell phone regarding payments sent or received.

## IV.     TECHNICAL TERMS

23.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a)     Wireless telephone:  A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter and receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address

books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b)      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c)      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d)      GPS Navigation device:  A GPS navigation device uses GPS to display its current location.  It often records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The GPS consists of 24 Navigation Satellite Timing and Ranging (NAVSTAR) satellites orbiting

the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e) Personal Digital Assistant ("PDA"):  A PDA is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

f) Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the internet through cellular networks, 802.11 "Wi-Fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the internet, sending and receiving email, and participating in internet social networks.

g) Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications

network.  Some pagers enable the user to send, as well as receive, text messages.

h)  Internet Protocol ("IP") Address: An IP address is a unique numeric address used by computers on the internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i)  Internet: The internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the internet, connections between devices on the internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training, experience, and research, I know that the Subject Devices have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, PDAs, tablets, and pagers.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## V.   ELECTRONIC STORAGE

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

26.  I submit there is probable cause to believe that things that were once stored on the Subject Device may still be stored there, for at least the following reasons:

a)  Based on my knowledge, training, and experience, I know computer files or remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information.

d)      Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

## VI.     FORENSIC ANALYSIS

27.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant but also forensic evidence that establishes how the Subject Devices were used, the purpose of their use, who used them, and when. I submit there is probable cause to believe this forensic electronic evidence might be on the Subject Devices because:

a) Data on the storage medium can provide evidence of a file, or a portion of a file (such as a paragraph in a word processing file) that was once on the storage medium but has since been deleted or edited.  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Internet browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

b) Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact electronically stored information on a storage medium necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not

present on a storage medium.

28.     Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for would permit the examination of the Subject Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection to determine whether it is evidence described by the warrant.

29.     Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

## VII.     CONCLUSION

30.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/
John W. Ogden
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to telephonically on:    August 9, 2024

Honorable Carolyn K. Delaney
UNITED STATES MAGISTRATE JUDGE

Approved as to form by:

NICOLE MOODY
Special Assistant United States Attorney

## **ATTACHMENT A**

The property to be searched consists of the following electronic devices:

A.     A black Apple iPhone, with a cracked back, which is assigned FBI evidence number 1B158 ("Subject Device 1");

B.     A black Apple iPhone, which is assigned FBI evidence number 1B159 ("Subject Device 2") (collectively, the "Subject Devices").

This warrant authorizes the forensic examination of the Subject Devices for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1. All records on the Subject Devices described in Attachment A that relate to the production, transport, possession, use, purchase, or other activity related to the procurement of false identification documents (i.e., Social Security Administration cards, driver's licenses, passports, and other means of identification) and involve Javier Aguilera Rosas or Myra Minks, including but not limited to:

    a. lists of customers and related identifying information;

    b. types, amounts, and prices of identification documents trafficked as well as dates, places, and amounts of specific transactions;

    c. images of identification documents and any tools used to create or transport identification documents;

    d. any information related to sources of identification documents (including names, addresses, phone numbers, or any other identifying information);

    e. all bank records, checks, credit card bills, account information, and other financial records; and

    f. any and all communications with Myra Minks.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include whatever form and by whatever means the records or information may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT
for the
Eastern District of California

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched* )<br>*or identify the person by name and address)* )<br> )<br>Two cellular telephones seized from )<br>Javier Aguilera Rosas on June 18, 2024 )<br> ) | Case No. 2:24-sw-0776 CKD |

## SEARCH AND SEIZURE WARRANT

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the __EASTERN__ District of __CALIFORNIA__
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before  __August 23, 2024__
*(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.   ☑ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge __any duty magistrate judge__ .
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30).*
☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: __August 9, 2024 at 3:53 pm__      */s/ Carolyn K. Delaney*
*Judge's signature*

City and state:  __Sacramento, California__      __Hon. Carolyn K. Delaney, U.S. Magistrate Judge__
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subscribed, sworn to, and returned before me this date.  _____  _____
                                                                       *Signature of Judge*                    *Date*